**Mark Ahlemeyer, OSB No. 095997**
**Assistant Federal Public Defender**
Email: mark_ahlemeyer@fd.org
101 SW Main Street, Suite 1700
Portland, OR  97204
Tel: (503) 326-2123
Fax: (503) 326-5524

**Attorney for Defendant**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>                      **Plaintiff,**<br><br>                   v.<br><br>**TYRONE LAMONT ALLEN,**<br><br>                      **Defendant.** | Case No. 3:18-cr-00072-HZ<br><br>**MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT**<br><br>*Evidentiary Hearing Requested* |

Pursuant to the Fifth Amendment's Due Process Clause and Federal Rule of Criminal Procedure 12(b), the defendant, Tyrone Lamont Allen, through counsel, respectfully moves this Court to suppress any identification evidence against him based on or related to the photo line-up used in this case.  Without contemporaneously documenting their actions in an official report, investigators manipulated a photograph of Mr. Allen to make him look more consistent with the perpetrator (who was captured on video surveillance), and then used that altered image to secure positive identifications from two witnesses.  For the reasons stated below, these tactics violate due

process and risk undermining the integrity and fundamental fairness of the trial process. Accordingly, the evidence should be suppressed.

**I.      Relevant Factual Background**

Between April 3 and April 7, 2017, an individual robbed or attempted to rob four different banks or credit unions in Portland, Oregon.[1]  Based on video surveillance, the individual appeared to be a black male wearing a hat and glasses.  Below are two representative still shots of the robber that were taken from bank videos and produced by the government in discovery:

 

Disc. at 128 (Wells Fargo), 238 (Advantis Credit Union).[2]  The robber was not apprehended at the scene, nor was any of the stolen money recovered.

---

[1] For the purposes of this motion, the defense will assume the government is correct in believing the same man was responsible for all four incidents.  The specific dates and locations of the robberies are as follows:  April 3, 2017 (OnPoint Community Credit Union); April 5, 2017 (Wells Fargo); April 7, 2017 (Bank of the West); and April 7, 2017 (Advantis Credit Union).

[2] These two surveillance shots are from the two banks where the tellers later selected Mr. Allen's photo from the array.

**Page 2   MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT
(*Evidentiary Hearing Requested*)**

Investigators interviewed the four victim tellers on the days of the respective robberies, and seized and reviewed each bank's video surveillance. None of the tellers reported seeing any distinctive marks or tattoos on the robber's face, which was consistent with the surveillance video. Disc. at 113, 132, 197, 220.

On April 18, 2017, Mr. Allen was arrested during a traffic stop on unrelated warrants. Disc. at 27. Toward the end of April, investigators received a tip from an individual claiming to know Mr. Allen, who reported having seen the robbery suspect's picture on the news and, after comparing it to Mr. Allen's mugshot, believed Mr. Allen was the robber.[3]

Investigators then created a photo line-up to show to the four victim tellers. The process of putting together that line-up appears not to have been documented in any contemporaneous report. Six pictures, including one of Mr. Allen, were presented to the tellers on May 2nd and May 3rd of 2017. The teller at the April 3rd robbery did not make a selection. The teller at the April 5th robbery, Ms. Courtney Trent, picked Mr. Allen's photo. The teller at the first robbery on April 7th picked one of the filler photographs. Finally, the teller at the second robbery on April 7th, Ms. Erin Purslay, selected Mr. Allen's photo.

The photos from the line-up were produced in discovery. However, no reports were provided about the production of the line-up or any alterations to the pictures. In fact, nothing at all in the discovery acknowledges that investigators materially altered Mr. Allen's photograph prior to showing it to the victim tellers. But a side-by-side comparison of the source photo—Mr.

---

[3] It is unclear from the discovery whether police received the same tip from the same person on two occasions, or whether they received the exact same tip from two different individuals. Given the similar details in both tips, it is likely that the former is the case.

Allen's April 2017 booking photo—and the one used in the line-up shows that investigators altered the source photo to conceal Mr. Allen's multiple facial tattoos:

**BOOKING PHOTO**           **LINE-UP PHOTO**

 

Disc. at 93, 101.

The government now seeks to admit at trial identification evidence from the two tellers who identified Mr. Allen as the robber after being presented with the doctored image.

## II.  Argument

The novel question in this case is whether the government can materially alter a suspect's photograph in a way that makes him look more like the perpetrator, then secure an eyewitness identification based on that manipulated photo, and ultimately present that positive identification to a jury. The Court should reject this type of fabricated evidence either as a violation of due

process or under the Court's inherent supervisory power to ensure the integrity of the judicial process.

### A. Identifications Of Mr. Allen Resulting From The Presentation Of A Materially Altered Source Photograph Were Unconstitutionally Suggestive And Should Be Suppressed As Unreliable.

The Fifth Amendment right to due process bars the introduction of identification evidence where it was procured or tainted by unnecessarily suggestive law enforcement procedures that created a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972); *Simmons v. United States*, 390 U.S. 377, 384 (1968); *Manson v. Brathwaite*, 432 U.S. 98, 113-14 (1977). If the Court determines that the challenged procedures were unnecessarily suggestive, suppression is required unless the Court also finds that the identifications were nonetheless reliable under the "totality of the circumstances." *Biggers*, 409 U.S. at 199. Generally, courts have looked to the following non-exclusive factors to assess reliability: (1) the witness's opportunity to observe the individual at the time of the crime; (2) the degree of attention focused on the individual by the witness; (3) the accuracy of the witness's description of the individual prior to the challenged procedure; (4) the level of certainty demonstrated by the witness during the challenged procedure; and (5) the elapsed time between the crime and the identification procedures. *Id.* at 199-200.[4]

Here, investigators' removal of Mr. Allen's facial tattoos in the line-up photo was unnecessarily suggestive. The bank surveillance video did not show any facial tattoos on the

---

[4] In 2012, the Oregon Supreme Court analyzed decades' worth of scientific research and called into question the value of some of these factors. *State v. Lawson*, 352 Or. 724 (2012). For example, the Court noted that research demonstrated "witness confidence or certainty is not a good indicator of identification accuracy." *Id.* at 745. Nonetheless, the Court observed that such evidence "has substantial potential to influence jurors." *Id.*

**Page 5   MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT** (*Evidentiary Hearing Requested*)

robber, and none of the four tellers reported such distinctive characteristics. Presumably, investigators believed that showing the tellers Mr. Allen's real face would decrease the likelihood of a positive identification, so they simply chose to make Mr. Allen look different than he actually does. There was nothing "necessary" about making these changes. *See Manson*, 432 U.S. at 109 (state acknowledged that procedure was unnecessary because there was no emergency or exigent circumstances). Moreover, it is hard to fathom any photo array conduct that is more "suggestive" than altering a source photograph for the sole purpose of making the investigation target look more like the perpetrator.

By presenting an unnecessarily suggestive fake picture of Mr. Allen to the bank tellers, investigators created a substantial likelihood of misidentification. After all, the tellers did not actually identify a picture of Mr. Allen; instead, they selected an image that had been altered to make Mr. Allen appear different than he actually does. Case law does not provide guidance on how the Court should analyze "reliability" in the context of a photograph that has been manipulated to remove distinctive features of a suspect so that the image would be consistent with objective evidence of what the true perpetrator looked like. Indeed, the law in this area developed in very different circumstances than are present here. Where courts have previously found police tactics to be unnecessarily suggestive, the "reliability" analysis then turned to factors related to a witness' ability to perceive and recall a perpetrator; hence the development of the five factors listed above.

Here, however, although there are certainly reasons to question the witness' perception and memory in the context of a brief, stressful interaction, the issue is not whether the due process clause would have barred their identification of a true photograph of Mr. Allen. Instead, the question is whether their identification of a doctored image of Mr. Allen is sufficiently reliable to

**Page 6   MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT
(*Evidentiary Hearing Requested*)**

be admissible. This type of "reliability" analysis does not appear to have been done in other cases, presumably because investigators have not crossed the line of materially altering a suspect's photo. In this case, the Court should make clear that a necessary precursor to any "reliability" test under *Biggers* is that the government has used an actual, unaltered photograph of a suspect. If it does not, the identification is inherently unreliable and must be suppressed.

This approach would prevent the untenable alternative of the Court having to embark (in this case and in the future) on a metaphysical inquiry to determine when a picture has been changed or manipulated enough to no longer be the accurate picture it once was. It is unclear what standards the government would propose for such an inquiry. And permitting the government to secure convictions based on a new method of altering subject photographs to match objective evidence or witness reports would almost certainly lead to more convictions of innocent people. *See Lawson*, 352 Or. at 749 n.5 (As of 2012, "[e]yewitness misidentification has contributed . . . to 72 percent of the 301 wrongful convictions revealed by DNA evidence.").

The Supreme Court has given an "admonition" to all federal courts that they must be on alert for subtle and slight deviations in practice that could ultimately have grave consequences for the fair administration of justice: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Scneckloth v. Bustamonte*, 412 U.S. 218, 228-29 (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886)). The government should not be allowed in this case to get its "first footing" into deliberately altering suspect photos to match the objective evidence of what a

**Page 7   MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT  
(*Evidentiary Hearing Requested*)**

perpetrator looked like. For that, and all the above reasons, the identification evidence in this case should be suppressed.

> B. In The Alternative, The Court Should Exercise Its Inherent Supervisory Power To Exclude The Identification Evidence In This Case.

"A district court may exercise its supervisory power 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and to deter future illegal conduct.'" *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)). In *Chapman*, the Ninth Circuit affirmed a district court's dismissal of an indictment with prejudice where the government had failed in its discovery obligation. *Id.* at 1088. However, the court noted that dismissal is only appropriate where a defendant "suffers substantial prejudice and where no lesser remedial action is available." *Id.* at 1087 (internal quotations and citations omitted).

Here, unlike *Chapman*, dismissal with prejudice is not warranted because there is an available "lesser remedial action"—suppression of the identification evidence. This would prevent any prejudice to Mr. Allen and would "preserve judicial integrity" by ensuring that the jury's decision "rests on appropriate considerations." *Id.* at 1085.

Condoning the government's actions in this case would be a slippery slope given that the advent of modern technology allow for easy manipulation of photographs. If the government is permitted to alter a person's image simply to increase the likelihood of a positive identification, where is the limiting principle to know it has gone too far? If a witness reports that a perpetrator did not have any front teeth, can the government simply black out a suspect's teeth on the theory that it could be done with cosmetics? Or if a suspect's skin color is too dark or too light as

**Page 8**   MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND MEMORANDUM IN SUPPORT
(*Evidentiary Hearing Requested*)

compared to objective video evidence, can the government simply press a few strokes on a computer keyboard and adjust the color to match that objective evidence?

By excluding the identification evidence in this case, the Court will avoid that slippery slope and deter similar suggestive identification procedures in the future. *See Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place."). This is especially important in this case because law enforcement apparently made the deliberate decision not to contemporaneously document what it had done to Mr. Allen's photograph. As noted above, nothing in discovery—other than the line-up picture itself—suggested anything out of the ordinary had occurred. This is especially concerning given the possibility that law enforcement can make more subtle changes to photographs that might not be easily detectable. For example, under the government's approach in this case, there would presumably be nothing wrong with adjusting various pixels to make someone's face appear slimmer, so long as the government's theory was that the suspect had gained weight since the crime. Unlike this case, such changes would be practically impossible to detect if not reported.

Excluding the evidence in this case also does not implicate the primary concerns courts have expressed about the costs of suppressing evidence. The Supreme Court has "recognized that unbending application of the exclusionary sanction to enforce ideals of government rectitude would impede unacceptably the truth-finding functions of judge and jury." *United States v. Leon*, 468 U.S. 897, 907 (1984) (quoting *United States v. Payner*, 447 U.S. 727, 734 (1980)). But this concern is generally only applicable in cases where the suppressed evidence is obviously reliable

and inculpating.  In *Leon*, for example, the evidence at issue was "large quantities of drugs."  *Id.* at 902.

In this case, those traditional concerns about exclusion would exist if Mr. Allen were seeking to suppress concrete and tangible evidence, such as if he were apprehended with the stolen money, bait bills, or a tracker.  But that is not the situation; instead, Mr. Allen seeks to suppress evidence of questionable reliability and questionable worth.  In addition, this is not a case where suppression would eliminate the entirety of the government's evidence, as nothing prevents the government from attempting to prosecute Mr. Allen based on the objective video surveillance of the bank robber.  Thus, the costs of suppression are low.

In contrast, the benefits of suppression are high.  The Court would be deterring officers in future investigations from manipulating evidence to rig the outcome of photo arrays.  Furthermore, the Court would also be deterring officers from any attempts to conceal their manipulation by failing to create a report of their actions.  The upshot of stopping this new approach to creating photo arrays would almost certainly be a reduction in misidentifications, which would ultimately prevent the incarceration of innocent people.  *See Lawson*, 352 Or. at 749 n.5

"Supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system:  'Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.'"  *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004) (quoting *McNabb v. United States*, 318 U.S. 332, 340 (1943)).  In this case, should the Court find suppression unwarranted under the due process clause, it should nonetheless suppress the evidence under its

supervisory powers to vindicate the integrity of the judicial process by ensuring the jury's verdict is based on proper considerations.

## III.    Conclusion

For the reasons stated above, Mr. Allen respectfully requests that this Court suppress any identification evidence based on or related to the materially altered picture used in the photo array. Should the Court find that suppression is not warranted on the current record, Mr. Allen requests an evidentiary hearing to further develop facts related to police conduct in this case, as well as the reliability of the victim tellers' identifications.

RESPECTFULLY submitted this 12th day of July, 2019.

*/s/ Mark Ahlemeyer*
Mark Ahlemeyer
Assistant Federal Public Defender