BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**PAUL T. MALONEY, OSB#013366**
Assistant United States Attorney
Paul.Maloney@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:18-cr-00072-HZ** |
| **v.** | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION EVIDENCE** |
| **TYRONE LAMONT ALLEN,** | |
| **Defendant.** | |

The United States of America opposes defendant's motion to suppress (ECF #45). The

identification procedures investigators used were necessary and reliable, and ensured that

defendant did not stand out from the pack in the photo lineup.

An informant told investigators that defendant—who has elaborate face and neck

tattoos—was the serial bank robber striking Portland area banks in April 2017. Two eye-

witnesses who got close to the robber described him as having "faded" tattoos, but none of the

other witnesses reported facial tattoos, and none are readily visible on the surveillance images of

**Government's Response to Defendant's Motion to Suppress** **Page 1**
**Identification Evidence**

the robber's face. Investigators compared defendant's photo to the surveillance image and saw

enough similarities in the immutable facial features to include defendant in the photo array,

knowing that tattoos are easily concealed with make-up.

Investigators digitally removed the tattoos from defendant's photograph for the photo

lineups with the robbery victims. The technique was neither suggestive, nor unreliable and

defendant's motion should be denied.

I.      FACTUAL BACKGROUND AND PROCEDURAL POSTURE

        A.      *The OnPoint Community Credit Union Robbery*

On April 3, 2017, at approximately 4:40 p.m., Portland Police Officers responded to a

robbery call at the OnPoint Community Credit Union located at 1720 NE 9th Avenue, Portland,

Oregon. The credit union suffered a loss of approximately $6,000.

The victim teller told police that an unknown subject, hereafter referred to as "the

robber," came up to his counter with a $20 bill and asked him if he could exchange it for $1 bills.

When the victim teller opened the till, the robber leaned forward onto the counter and opened up

a white plastic shopping bag. The robber told the victim teller, "Give me your mother fucking

money! I have a gun! I will blow your head off." The victim teller put approximately $6,000 into

the plastic bag. The robber kept telling the victim teller to "go faster" and began counting down

"5, 4, 3," Once the bag was full, the robber ran out of the bank and north up NE 9th Ave.

The teller described the robber as a black male, about 5'10" and 180 pounds, wearing a

gray hoodie, a gray baseball cap with red emblem, dark pants, and he had tattoos on both his

hands. Other witnesses similarly described the robber's appearance but stated that they did not

get a good look at his face, and did not think they would recognize him.

Investigators seized electronic surveillance images of the suspect from OnPoint Community Credit Union, but recovered no fingerprints. The surveillance images matched the teller's basic description. Images from this robbery are attached as Government's Exhibit A.

**B.      *Wells Fargo Bank Robbery***

On Tuesday April 4, 2017, at 4:58 p.m., Portland Police officers responded to a report of a robbery at the Wells Fargo Bank located at 5730 NE Martin Luther King Jr. Boulevard in Portland, Oregon.

The victim teller reported to the police that the robber came up to her counter with a $20 bill and asked her if he could exchange it for $1 bills. The victim teller was in the process of counting out 20 $1.00 bills when the robber told her he had a gun in his pocket. He told her she needed to give him all of the large bills in the drawer. The victim teller said the robber whispered, "I'll blow your brains out!" The robber had his right hand in his pocket and motioned as if he had a gun in it. The victim teller gave the suspect all of her larger bills, which totaled approximately $2,772 in US currency. The robber then ordered the victim teller's co-worker do the same. The victim teller stated that her co-worker appeared to be in a daze and did not respond to the robber's demand. The robber then fled the bank.

The victim teller described the robber as a light-skinned black male, mid 30s to mid-40s, 5'8-5'10", medium build, with faded tattoos on both sides of his neck, stubble on his face, and wearing a medium gray hooded sweatshirt, a gray baseball cap and wire rimmed glasses.

A bank customer reported standing next to the robber at a separate teller station during the robbery. He told police he heard the robber tell the victim teller, "Do it now." When he looked at the robber, he noticed the suspect leave very quickly. He described the robber as a black male in his 40's, 5'8" to 5'10" tall with tattoos on his neck. He said the robber was

**Government's Response to Defendant's Motion to Suppress**                                          **Page 3**
**Identification Evidence**

wearing grey clothing, glasses and a hat. The customer said he did not get a good look at the robber's face.

Another bank customer who was standing in line behind the robber described the robber as a light-skinned black male, 5'11" tall, 47 years of age, 275 pounds, muscular, with short hair and faded tattoos all over his face and neck. The customer stated the robber was wearing a gray hooded sweatshirt over a white t-shirt, black sweatpants with one pocket completely inside out. A separate bank customer, who was also in line with the robber, gave a similar description but did not recall any face or neck tattoos.

Investigators received photographic images of the robbery suspect from Wells Fargo Corporate Security, and immediately noticed that the images appeared to be the same person as the robber from the OnPoint Community Credit Union. Images from this robbery are referenced and attached to this affidavit as Government's Exhibit B.

### C.    *Bank of the West Robbery*

On Friday April 7, 2017, at 1:08 p.m., Portland Police officers responded to a report of an attempted bank robbery at the Bank of the West located at 905 NE Halsey Street Portland, Oregon.

The victim teller reported to the police that he first noticed the robber standing in line. The robber allowed a customer in front of him to go first. The victim teller saw some cash in the robber's hand. The robber walked to the teller's counter; the robber leaned over the counter with his head down. The robber then put a Safeway plastic bag on the counter and stated, "Give me all your money." The victim teller said the robber was kind of laughing, so he did not think he was serious. The victim teller asked him "what you say" and the robber repeated, "Give me all your fucken money or I'll shoot you." The victim teller reported his hands were on the counter above

his cash because he was planning to give him his cash. The robber then said, "Give me all your money or I'll blow you up." The victim teller stated that he was very scared, and saw the suspect raise his shirt and grab as if he had a gun. The victim teller said he was a little shocked and just stood there. The victim teller reported the robber then said, "Don't push the fucken alarm, you pushed the fucken alarm, fuck you," and then the robber ran out of the bank.

Investigators interviewed to the victim teller shortly after the robbery, and noticed that he was noticeably shaken from the incident. The victim teller described the robber as a black male, 45 to 50 year old, 6'1", 250 pounds, wearing a blue baseball cap with white lettering, thick black glasses, navy colored sweatshirt, grey sweat pants, light colored shoes, white t-shirt under sweatshirt, and was carrying a Safeway shopping bag. The robbery scene was processed but no fingerprint evidence was recovered.

Investigators received electronic surveillance images of the robber from Bank of the West Corporate Security. From the images, investigators determined the robber appeared to be the same person from the aforementioned robberies. During this robbery, the robber was wearing a blue colored baseball cap with "RDO" in white lettering, a dark colored hooded sweatshirt, and gray sweatpants. Images from this robbery are referenced herein and are included with this affidavit as Governments Exhibit C.

### D.    *Advantis Credit Union Robbery*

On Friday April 7, 2017, twenty minutes after the Bank of the West robbery, at approximately 1:20 p.m., Portland Police officers responded to a report of a bank robbery at the Advantis Credit Union located at 3515 NE 15th Avenue in Portland, Oregon. The credit union, whose deposits were then insured by the NCUA, suffered a loss of approximately $5,335 in US currency.

The victim teller reported to the police that the robber entered the credit union, approached her teller station and threw a plastic bag at her. The robber then put his head down and said something. The victim teller asked the robber what she could help him with, as she did not understand his request. The robber replied, "I have a gun, if you don't put the money in the bag, I'm going to kill you. I'll find where you live." The robber then started counting down saying, "5... 4... 3..."

The victim teller started opening her teller drawer, and the robber told her "Quicker." The victim teller told the robber that if she went any quicker everyone would know what was going on. The victim teller filled the bag with money from her drawer, which totaled approximately five thousand three hundred thirty-five dollars ($5,335) in US currency. The robber then took the bag, ran out of the credit union, then turned south along the outside of the credit union, and fled toward NE Fremont St.

Investigators interviewed to the victim teller shortly after the robbery. As she described the incident, she was crying and appeared noticeably shaken. The victim teller described the robber as a black male, 30 to 49 years old, about 5' 10", 185 pounds, with a medium complexion and a heavy build. The robber was wearing glasses, a black baseball cap with white lettering, a red hooded sweatshirt, and blue jeans.

Investigators received electronic surveillance images of the robbery suspect from Advantis Credit Union. After reviewing the images, investigators determined that the robber was the same person who committed the other robberies. The hat worn by the robber was appeared to be the same hat as worn in the Bank of the West robbery attempt, and the robber's face appeared to be the same as the person who committed the other robberies. Images from this robbery are attached as Government Exhibit D.

**Government's Response to Defendant's Motion to Suppress**                                    **Page 6**
**Identification Evidence**

### E.    Informant Identifies Defendant as the Robber

After the Advantis robbery, investigators released images of the robbery suspects from Advantis and OnPoint to the media in an attempt to identify the robber. On April 27, 2017, an anonymous informant reported to uniformed Portland Police patrol officer that he had information about a major crime. The informant went on to describe how his roommate, whom he also did not want to identify, had shown him the press coverage related to the robberies and bragged to him that Tyrone Allen was committing these robberies.

### F.    Photo Identifications with Victim Tellers

Using a booking photo from a recent arrest of defendant, investigators submitted the photo to a technician to see if defendant's facial tattoos could be digitally removed from the image. A copy of the booking photo showing defendant's elaborate facial tattoos is attached as Government's Exhibit E. Using a photo editing software, the technician matched defendant's skin tone, was able to successfully disguise defendant's facial tattoos.

Investigators compiled other photos several other black males who shared similar features and characteristics of defendant and the robber. A copy of the photo identification series that was used with the OnPoint victim is attached as Government's Exhibit F. The same series of photos were used with each victim teller.

Each photo was printed on a separate page, so the victim teller could view each photo individually. Investigators admonished the witnesses with the standard admonishment before serially presenting the photos to the witness for identification. The photos were presented to the witness in random order, and the presenting officer did not know which photo the witness was viewing until after the witness had finished looking at each photo. If the witness was able to make an identification, the investigators asked the witness why they picked the photo, and

**Government's Response to Defendant's Motion to Suppress**                              **Page 7**
**Identification Evidence**

inquired about the witnesses' level of certainty of the identification. The investigators used the following six photos with each witness:



*Random ID Photo*          *Random ID Photo*          *Random ID Photo*

*Defendant ID Photo*       *Random ID Photo*          *Random ID Photo*

1.  OnPoint Victim: Unable to Make an Identification

On May 2, 2017, investigators contacted the victim teller from the OnPoint robbery. He described the robber as a black male, approximately 5'10" with glasses and a baseball hat. The investigator assembled a sequential photo array and gave the teller the standard admonition that the robber may or may not be included in the series of photos he was about to be shown. Defendant's photo, with his facial tattoos removed, was included in the array. The victim teller

**Government's Response to Defendant's Motion to Suppress          Page 8**
**Identification Evidence**

viewed all the photos in the lineup twice and stated that he was unable to make a selection. He stated that the robber "had messed up teeth, might have been gold," and "he had sleeves, but I could see tattoos on [both of] his hands." Investigators noted defendant had tattoos on both of his hands when he was arrested in April 2017.

2.    Bank of the West Victim: Identified Defendant as the Robber

On May 2, 2017, investigators contacted the victim teller from the Bank of the West robbery. Using the same photos as those used in with the OnPoint victim teller, investigators gave the Bank of the West teller the standard admonition that the robber may or may not be included in the series of photos he was about to be shown. Defendant's photo, with his facial tattoos removed, was included in the array. The victim teller looked the photographs and identified photo #3 in the array as the robber. Defendant's photo was number three in the series he was shown.[1] When asked, what made him say that, the teller stated, "The way his face is, it's narrower, the others were too round." The investigator noticed that the teller was covering up the top portion of each subject's face. The teller said he was doing that because, "I can picture him with his hat and glasses on and how that would look." When asked how confident he was in this identification, the victim teller stated, "6 or 7" adding, "The lower half of [the] face is pretty close."

3.    Advantis Victim: Identified Defendant as the Robber

On May 2, 2017, investigators contacted the victim teller from the Advantis robbery. Using the same photos as those used with the other tellers, investigators gave the Advantis teller

---

[1] There is a discrepancy about the Bank of the West teller identification. Defendant's motion states that the Bank of the West teller identified the wrong suspect in the series. This mistake was likely a result of an error reported by investigators. Upon review of the actual photos, documents and evidence from the photo identification, the witness identified defendant's photo (photo #3 in the series) as the robber.

the standard admonition that the robber may or may not be included in the series of photos she was about to be shown. Defendant's photo, with his facial tattoos removed, was the third photo in the array. The victim teller looked the first two photographs and said "No." When she looked at the third photo (defendant's), the victim teller stated, "That looks like him." She viewed the remaining photos in the series, and she stated "No." to each of those. The teller went through the series of photos a second time, in the same order and indicated that photo number three appeared to be the suspect. When asked, why she thought photo number three was the robber, she stated, "his nose, that's the facial feature I remember most, he had a wide face and a wide nose." When asked how confident she was in this identification, the victim teller stated, "90%."

4.    Wells Fargo Victim: Identified Defendant as the Robber

On May 3, 2017, investigators contacted the victim teller from the Wells Fargo robbery. Using the same photos as those used in with the OnPoint victim teller, investigators gave the Wells Fargo teller the standard admonition that the robber may or may not be included in the series of photos she was about to be shown. Defendant's photo, with his facial tattoos removed, was included in the array. The victim teller viewed each photo she was handed, returning them to the investigator stating, "Move on." When she was handed defendant's photo she stated, "I think this is him." When asked, "What about that makes you say that," the teller stated "The face is really clear. I'll never forget that face. This is definitely him." When asked how confident she was in this identification, the victim teller stated, "100%," adding, "If you put glasses on him, it's him. His eyes. His goatee; I definitely remember that. I'm positive."

Investigators preserved the photos used in each of the identification processes. The photos used were the same, but the photos were presented in random order to each separate witness.

**Government's Response to Defendant's Motion to Suppress                Page 10
Identification Evidence**

G.     *Grand Jury Indictment*

The grand jury returned an indictment charging defendant with two counts of credit union robbery, one count of bank robbery, and one count of attempted bank robbery in violation of 18 U.S.C. § 2113(a).

H.     *Defendant's Motion to Suppress Out of Court Identification Evidence*

Defendant has moved to suppress the out-of-court identifications in this case because the investigators applied the digital equivalent of make-up to a photo of defendant and used that photo in photo identifications with the victim tellers. Defendant contends this tactic violated defendant's due process rights, and seeks to suppress the photo identifications made by the victim tellers. Defendant's motion makes no distinction between instances of positive identification (Wells Fargo, Advantis, and Bank of the West victims), and no identification (OnPoint victim).

Each out of court identification, including the instances of no identification, is admissible. Defendant should not reap a windfall because the investigators were able to take steps to counteract his efforts to disguise his identity. Furthermore, the steps taken were necessary to effect a reliable identification, and prevent a misidentification of the robber.

## III.    RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

A.     *Legal Standards*

Out-of-court identifications may be excluded if the trial court determines that the procedure used violates a defendant's due process rights. The inquiry is a two-step process. First, the court must decide if the police used an unnecessarily suggestive identification procedure. If so, then the court must "consider whether, and the improper procedure so tainted the resulting identification as to render the identification unreliable." *Perry v. New Hampshire*, 565 U.S. 228,

**Government's Response to Defendant's Motion to Suppress**                    **Page 11**
**Identification Evidence**

(2012), *citing Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). The following is a non-exclusive list of factors for determination of reliability: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the degree of attention the witness paid to the criminal; (3) the accuracy of the witness' prior description of the criminal; (4) the witness' level of certainty in the identification; and (5) the time between the crime and the identification. *Biggers*, 409 U.S. at 199-200. *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986). The inquiry is a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597 (1982). Courts evaluate due process claims against out-of-court identification procedures in light of the totality of the circumstances. *Simmons v. United States*, 390 U.S. 377, 383 (1968). The "primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Biggers*, at 381, *quoting Simmons*, 390 U.S. at 384.

Where Supreme Court authorities have involved show-ups or single photograph identification procedures, the Ninth Circuit has held that photo lineups may also be impermissibly suggestive. *Van Tran v. Lindsey*, 212 F.3d 1143, 1156 n.18 (9th Cir. 2000), (*overruled on other grounds, Lockyer v. Andrade*, 538 U.S. 63 (2003)). Due process does not require that the other persons in the lineup be identical to defendant. *Id.*

### B.    *The Identification Procedure Was Not Unnecessarily Suggestive*

The identification procedures used were not suggestive. The investigators technique the investigators used did nothing to suggest to the witness that they should pick the defendant over any other person in the photo series. Indeed, had the investigators left defendant's face alone with his prominent and distinctive facial tattoos intact, arguably, that would have singled him out of the line-up marking him for a suggestive identification.

An even more problematic scenario would result if the investigators had pulled a series of photos of individuals matching defendant's characteristics, including facial tattoos. Such a procedure would be problematic because the photos would have been inconsistent with the descriptions provided by the victim tellers, none of whom reported seeing facial tattoos, and would have increased the likelihood of a misidentification.

At the time the investigators chose to use this technique, they had information that defendant was a serial bank robber. This was a serious felony, and the perpetrator was potentially still at large. If the informant had falsely identified defendant, then a serial bank robber would be at large, and the police would need to redouble their efforts to identify, locate and apprehend the robber. The procedure used was necessary to identify or exclude defendant as a suspect to the serial robberies.

The investigators used a technique to mimic the disguise defendant used during the robberies. They applied a disguise to defendant's image that was consistent with the images from the surveillance, and presented each witness with a choice of other similarly featured subjects from which to make an identification. The fact that one of the four witnesses did not identify defendant speaks to the procedure's lack of suggestibility. The investigators used a procedure that was necessary and appropriate to the circumstances of the investigation. The procedure did not suggest defendant as the robber over any other subject, and was calculated to reduce the likelihood of a misidentification.

### C.    *The Identifications of Defendant as the Robber Were Reliable*

The Bank of the West, Advantis and Wells Fargo tellers positively identified the defendant as the robber. The circumstances surround these identifications carry the hallmarks of reliability. Each robbery occurred indoors, in a well-lit business environment, and were captured

on surveillance video. The robber was the only person at the teller window during each robbery. The robber was a short distance away from each teller. The encounters were not fleeting. The defendant was at the counter in the Bank of the West for approximately 20 seconds. In the Avantis and Wells Fargo robberies, defendant was at the counter from nearly 60 seconds, conversing with each teller asking them to make change, before he threatened and robbed them. The tellers were focused on their encounter with the robber, and do not report being distracted by anything but the robber at their counter. When compared against the surveillance videos, each teller accurately described the robber.

The tellers identified defendant as the robber approximately four weeks after each robbery. The Bank of the West and Advantis robberies occurred on April 7, 2017 and the identifications were made May 2, 2017. The Wells Fargo bank robbery occurred April 4, 2017, and the identification was made May 3, 2017.

Each witness was able to state the degree of certainty in their individual identifications. The Bank of the West teller's certainty was a 6/7 out of 10. The Advantis teller was 90% certain defendant was the robber. The Wells Fargo teller was 100% certain defendant was the robber.

Under the totality of the circumstances, these identifications are reliable. Each witness had ample opportunity to interact with the robber and observe the unique characteristics of the robber, which they were later able to describe to the investigators. Their descriptions were consistent with the surveillance images, and the descriptions provided by other witnesses to the robberies. There is little evidence to establish that the extra-judicial identification procedures were suggestive, or could potentially lead to the misidentification of defendant as the robber. To the contrary, the facts and circumstances surrounding the positive identifications establish that the procedures lead to a reliable identification.

**Government's Response to Defendant's Motion to Suppress**                    **Page 14**
**Identification Evidence**

Defendant's argument rests on cases where the authorities used suggestive identification procedures that made a defendant *stand out* in lineup. Here, the investigators took appropriate steps to make the defendant *blend in* with the other identification photos. It was appropriate to include defendant's photo for identification with the witnesses because the investigators had information from eyewitnesses that the robber had faded tattoos and an informant had relayed information identifying defendant, a man with facial tattoos, as the robber. However, the victim tellers did describe the robber as having facial tattoos, and facial tattoos were not visible in the surveillance images.

The investigators did not alter any of defendant's immutable facial features for his photo in the identification series. By covering up defendant's prominent facial tattoos, the investigators *minimized* the likelihood that defendant would stand out from the other photos in the identification series, and *reduced* the risk of suggesting the witnesses pick defendant out as robber.

## IV.    CONCLUSION

Defendant's motion to suppress the out-of-court identifications should be denied.

Dated: July 19, 2019                                Respectfully submitted,


                                                    BILLY J. WILLIAMS
                                                    United States Attorney


                                                    /s/ *Paul T. Maloney*
                                                    PAUL T. MALONEY, OSB#013366
                                                    Assistant United States Attorney


**Government's Response to Defendant's Motion to Suppress                  Page 15
Identification Evidence**