IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


UNITED STATES OF AMERICA,

          Plaintiff,

    v.

TYRONE LAMONT ALLEN,

          Defendant.

No. 3:18-cr-00072-HZ

OPINION & ORDER

Billy J. Williams
United States Attorney
District of Oregon
Paul T. Maloney
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204

      Attorneys for Plaintiff

Mark. P. Ahlemeyer
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, OR 97204

      Attorney for Defendant

HERNÁNDEZ, District Judge:

Defendant Tyrone Lamont Allen moves to suppress identification evidence based on photo lineups that included an altered photo of Defendant. For the reasons below, the Court denies Defendant's motion.

## BACKGROUND

### I.    Four Bank Robberies

Between April 3 and April 7, 2017, an individual ("the robber") robbed or attempted to rob four different financial institutions in Portland: OnPoint Community Credit Union (April 3); Wells Fargo (April 4); Bank of the West (April 7); and Advantis Credit Union (April 7).   Based on surveillance footage, investigators concluded that the same person committed all four robberies. Hawkinson Aff. ¶ 2, ECF 1.

At OnPoint Community Credit Union, the robber asked a teller for change for a $20 bill. *Id.* at ¶ 6. When the teller opened the till, the robber leaned forward and opened a plastic shopping bag. *Id.* The robber threatened to shoot the teller if he did not give the robber the money. *Id*. The teller gave the robber approximately $6,000. *Id.* The teller described the robber as a black male, about 5'10" tall, 180 pounds, wearing a grey hoodie and a baseball cap, and with tattoos on both hands. *Id.* at ¶ 7.

At Wells Fargo, the robber also asked a teller for change for a $20 bill. *Id.* at ¶ 11. As the teller began counting out change, the robber threatened the teller with a gun and asked for all the large bills in her drawer. *Id.* The teller complied and gave the robber approximately $2,772. *Id.* The teller described the robber as a light-skinned black male, mid-30s to -40s, 5'8" to 5'10" tall, medium build, with faded tattoos on both sides of his neck, stubble on his face, and said he was wearing a grey hoodie, a grey baseball cap, and glasses. *Id.* at ¶ 12.

At Bank of the West, the robber approached the counter and asked the teller to put all her money in a plastic grocery bag. Hawkinson Aff. ¶ 16. He threatened the teller and instructed the teller not to push the alarm. *Id.* The teller described being shocked and scared. *Id.* Ultimately, the robber ran out of the bank without any money. *Id.* The teller described the robber as a black male, 45 to 50 years old, 6'1" tall, and said he was wearing a blue baseball cap, glasses, and a navy sweatshirt. *Id.* at ¶ 17.

The Advantis robbery took place just after the Bank of the West attempted robbery. *Id.* at ¶¶ 14, 19. The teller reported that the robber approached her station and threw a plastic bag at her. *Id.* at ¶ 20. The robber told the teller that he had a gun and threatened to kill her if she did not put money into the bag. *Id.* The teller filled the bag with money from her drawer totaling approximately $5,335. *Id.* The robber fled. *Id.* The teller described the robber as a black male, 30 to 49 years old, about 5'10" tall, and said he had a medium complexion. *Id.* at ¶ 21. He was wearing a black baseball cap, glasses, and a red hooded sweatshirt. *Id.* Detective Hawkinson— the lead bank robbery investigator assigned to this case—also testified that a witness at one point described seeing faint tattoos on the robber, as if they had been covered up.

## II.     Defendant Identified as the Robber

After the robberies, investigators released images from the Advantis and OnPoint robberies to the media to try to identify the robber. Hawkinson Aff. ¶ 23. Detective Hawkinson recalls receiving information from two informants who recognized Defendant from news coverage of the bank robberies. Either one or both suggested that Defendant was wearing make-up.

///

///

### III.    Photo Identification

On May 2 and 3, 2017, investigators presented the tellers with a photo lineup that included a recent booking photo of Defendant. Hawkinson Aff. ¶¶ 33–36. At the hearing on Defendant's motion to suppress, Detective Hawkinson testified that Defendant's facial tattoos are visible in the original booking photo, so he asked a technician to digitally alter the photo to remove the tattoos on Defendant's head and neck from the photo. The technician used photo editing software to disguise Defendant's tattoos by capturing Defendant's skin tone and painting over the tattoo as though he was applying electronic makeup. He testified that the technician would have sampled the skin tone of the pixels surrounding a tattoo and gone over the tattoo with that sample color using a light brush. The technician had the lineup filler photos when he altered Defendant's photo but did not otherwise reference any materials in making these changes.[1]

The photo series included other black males who shared similar features. *See* Gov't Ex. F (photo series), ECF 47-6. The same photo identification series was used with all four tellers. The procedure used by investigators was a "double-blind identification procedure." The photos were presented one at a time so that the tellers could view each photo individually. The presenter admonished the tellers with the "standard admonishment" that the robber may or may not be included in the series of photos before the photos were presented to the tellers for identification in random order. Each photo was presented in a manila folder so that the presenter could not see

---

[1] In the briefing, Defendant notes that the Government did not contemporaneously document its actions in an official report.  In discovery, the Government produced only the line-up photos and produced no reports about the production of the line-up or about any alteration to the photo.  This does not affect the outcome here, but a better practice for the Government in the future would be for the technician or the case agent to create a report describing the line-up and photo alteration process and to produce that report in discovery.

which photo the teller was viewing, and the presenter did not know who the suspect was in the array.

The OnPoint teller was unable to make an identification after viewing all the photos in the lineup twice. Hawkinson Aff. ¶ 34; Gov't Ex. F at 2. The teller said that the robber "had messed up teeth, might have been gold" and tattoos on both hands. Gov't Ex. F at 2.

The Bank of the West teller identified Defendant's photo.[2] When asked why he identified Defendant, he said it was the "way his face is, its narrower, the others were too round." Gov't Hr'g Ex. 3. When viewing the photos, the teller also covered up the top portion of each face to better replicate how the individual would look with a hat and glasses. He reported his confidence level that the photo selected was the robber as a "6 or 7" and noted that "the lower half of [the] face is pretty close." *Id.*

The Advantis teller also identified Defendant as the robber. Hawkinson Aff. ¶ 35; Gov't Hr'g Ex. 4. When presented with Defendant's photo, the teller said "[t]hat looks like him." Gov't Hr'g Ex. 4. She thought he was the robber because of his "wide face" and "wide nose," which was the facial feature she remembered best. *Id.* She reported that she was 90% confident. *Id.*

The Wells Fargo teller identified Defendant as the robber. Hawkinson Aff. ¶ 36; Gov't Hr'g Ex. 5. When presented with Defendant's photo, she stated, "I think this is him." Gov't Hr'g Ex. 5. She explained: "The face is really clear. I'll never forget that face. This is definitely him." *Id.* She reported being 100% confident, adding "if you put glasses on him, its him. His eyes. His goatee; I definitely remember that. I'm positive." *Id.*

_____

[2] In his affidavit submitted with the criminal complaint, Detective Hawkinson wrote that the Bank of the West teller picked a different individual as the potential robber and was "unsure of her selection." Hawkinson Aff. ¶ 34. But the Government clarified in its motion that this was an error reported by investigators and that the teller did identify Defendant's photo in the series. Gov't Resp. 9 n. 1; Gov't Hr'g Ex. 3.

On May 12, 2017, officers executed a search warrant for a vehicle driven by Defendant. Hawkinson Aff. ¶¶ 29, 37. They located several black hooded sweatshirts and grey sweatpants. *Id.* at ¶ 37. When officers executed another search warrant on May 16, 2017, they recovered a grey hooded sweatshirt. *Id.* at ¶ 38.

## IV. Procedural History

On February 27, 2018, the grand jury returned an indictment charging Defendant with two counts of credit union robbery, one count of bank robbery, and one count of attempted bank robbery in violation of 18 U.S.C. § 2113(a). Indictment, ECF 9, 10. Defendant now moves to suppress the identifications because investigators modified his photo to remove his facial tattoos.

## DISCUSSION

Defendant moves to suppress eyewitness identification based on or related to photo lineups that included a modified photograph of Defendant. Def. Mot. Suppress 1, ECF 45. Defendant seeks suppression of this evidence under both the Due Process Clause of the Fifth Amendment and the Court's inherent supervisory authority. *Id.* at 4–5. Because the procedure used by law enforcement officers was not unnecessarily suggestive under the two-part test from *Neil v. Biggers*, the Court denies Defendant's motion.

## I. Fifth Amendment

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Thus, apart from certain constitutional guarantees, "state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence

presented at trial." *Id.* "Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice" has the Court "imposed a constraint tied to the Due Process Clause." *Id.* (internal citations and quotations omitted).

"When a witness identifies the defendant in a police-organized photo lineup, . . . the identification should be suppressed only where 'the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* at 238 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). In *Neil v. Biggers*, the Supreme Court established a two-part test for assessing whether the Due Process clause requires suppression of eyewitness identifications tainted by police procedure. 409 U.S. 188 (1972). First, the court must determine whether law enforcement officers "use[d] an identification procedure that [was] both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39. If so, rather than automatically excluding the evidence, the court is "to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 239 (quoting *Biggers*, 409 U.S. at 201).

The Court has emphasized that, "when the police use an unnecessarily suggestive identification procedure," *id.* at 241, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). "Where the indicators of a witness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Perry*, 565 U.S. at 239 (internal citations and quotations omitted). Courts should consider the following factors in "evaluating the likelihood of misidentification": (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3)

"the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199–200.

Proceeding to the first step of the *Biggers* test, the Court finds that law enforcement's photographic identification procedure was not unnecessarily suggestive. No binding precedent conclusively resolves this case. As both parties acknowledged at the hearing, the applicable caselaw focuses on photo lineups in which the filler photos are dissimilar to the defendant or descriptions of the suspect. *See, e.g.*, *United States v. Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005) (approving a photospread where only one individual had facial hair, two individuals had shorter hair than the others, and all individuals were of similar age with similar skin, hair, and eye color); *United States v. Nash*, 946 F.2d 679, 681 (9th Cir. 1991) (finding a photospread not unduly suggestive despite differences in individuals' complexion, nationality, and hair style). But in this case, there is no dispute over the composition of the lineup itself. Rather, the issue here is solely the modifications made to Defendant's photograph to cover his tattoos. Defendant argues that the removal of Defendant's tattoos from the photograph was unnecessarily suggestive because the video evidence did not show tattoos, and the tellers did not report that the robber had any facial tattoos. Defendant concludes that the sole purpose of the alteration was to make the target—Defendant—look more like the robber. Def. Mot. Suppress 5–6. The Government, in response, contends that "investigators applied the digital equivalent of make-up" to counteract Defendant's efforts to disguise his identity. Gov't Resp. 11, ECF 47. It also emphasizes the steps taken to obtain a reliable identification and prevent misidentification of the robber, arguing that leaving the distinctive facial tattoos intact "would have singled him out of the line-up[,] marking him for a suggestive identification." *Id.* at 12.

The Court shares Defendant's concerns about the police conduct at issue in this case. It remains unclear to this Court where the line between constitutional and unconstitutional police conduct lies with regard to editing the photograph of a defendant in a lineup. But wherever that line is, it was not crossed here. Under the specific circumstances of this case, the manipulation of Defendant's photo was not unnecessarily suggestive. First, the method of editing Defendant's photo was neutral. The technician who edited the photo did not reference any images of the robber. He removed the tattoos in the photo by matching the color used to cover the tattoos to the skin tones adjacent to them. The modification was also limited to the removal of Defendant's tattoos and did not otherwise alter Defendant's facial features. Second, at least one of the informants suggested to investigators that Defendant was wearing makeup, and a witness described seeing faint tattoos on the robber, as if they had been covered. This information provides an independent justification for the investigator's decision to alter Defendant's photograph to appear as though he had disguised his tattoos. Third, the photo lineup itself was conducted double-blind to eliminate bias and suggestibility. Photos were presented to the tellers one at a time, and the officers who presented the lineup were unfamiliar with Defendant and unaware of which photograph was being presented to the teller. Finally, three of the four tellers identified Defendant's photograph as the bank robber with a reasonably high degree of certainty. Given these circumstances, the Court finds that the photo lineup was not so unnecessarily suggestive as to create a substantial likelihood of irreparable misidentification in violation of Defendant's Fifth Amendment rights. The reliability of the identifications is an issue for the jury, and Defendant's motion is denied.

///

///

## II.    Supervisory Power

"Supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system: 'Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.'" *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004), *on reh'g in part,* 138 F. App'x 902 (9th Cir. 2005) (quoting *McNabb v. United States,* 318 U.S. 332, 340 (1943)). "A district court may exercise its supervisory power 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct.'" *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)).

The Court declines to exercise its supervisory powers to suppress the evidence at issue here. As described above, the Government did not violate Defendant's Fifth Amendment rights when they removed tattoos from his photo, and the reliability of the identification evidence is an issue most appropriate for the jury.

## CONCLUSION

The Court DENIES Defendant's Motion to Suppress [45].

IT IS SO ORDERED.


Dated this _____ day of September, 2019.



_____
MARCO A. HERNÁNDEZ
United States District Judge